```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
TREVOR BURNS,                                              16 CV 0782 (VB) (PED)

                        Plaintiff,
                                                           **DEFENDANTS' RULE 56.1**
           -against-                                       **STATEMENT**


THOMAS GRIFFIN, et al,

                        Defendants.
-----------------------------------------------------------X
```

Pursuant to Rule 56.1 of the Local Rules of this Court, defendants, through their attorney ERIC T. SCHNIEDERMAN, Attorney General of the State of New York, hereby submit the following statement of material facts as to which they contend there is no genuine issue in dispute.

1. Plaintiff, Trevor Burns, is an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). (Complaint, filed February 2, 2016 (Docket Entry 1) ("Compl."), p. 2).

2. All of the defendants are current and former employees of DOCCS, and all of plaintiff's claims arose while he was incarcerated at Green Haven Correctional Facility ("Green Haven"). (<u>Id.</u>)

**A.      Release of Chemical Agents in the Mess Hall**

3. C.O. Nagy was assigned to the chemical agent booth in the mess hall on August 3, 2015. (Declaration of C.O. Michael Nagy ("Nagy Decl."). ¶ 3, Ex. A BURNS 42-44).

4. The chemical agent booth is above the mess hall about twenty-feet high and from the booth C.O. Nagy could see directly into the mess hall. (<u>Id.</u>; Transcript of the deposition of plaintiff taken on April 28, 2017 annexed to the Declaration of Julinda Dawkins ("Dawkins Decl.") as Exhibit ("Ex.") A, p. 77-78).

5.      On August 3, 2015, two inmates were fist fighting in the West Mess Hall at Green Haven. (Dawkins Decl., Ex. A, p. 56, 62-63; Declaration of Former Correction Officer Robert J. Cocuzza ("C.O. Cocuzza Decl."), ¶ 5, Ex. A BURNS 107; Declaration of Former Lieutenant Robert Cocuzza ("Lt. Cocuzza Decl."), ¶ 3, Ex. A BURNS 40, Ex. B BURNS 49, Ex. C BURNS 45; Nagy Decl., ¶ 5, Ex. A BURNS 42-44; Declaration of Carl J. Pierce ("Pierce Decl."), ¶ 6, Ex. A BURNS 21-22, Ex. B BURNS 32-35, 46-49, 69, 72-74, 88-89, 99, 103-106).

6.      C.O. Cocuzza called for security to respond to the two inmates fighting. (C.O. Cocuzza Decl., ¶ 6, Ex. A BURNS 107).

7.      The two fighting inmates failed to comply with multiple commands from staff, including then supervising Sergeant, Robert Cocuzza, to stop. (C.O. Cocuzza Decl., ¶ 5-6, Ex. A BURNS 107; Lt. Cocuzza Decl., ¶ 3, Ex. A BURNS 40, Ex. B BURNS 49, Ex. C BURNS 45; Nagy Decl., ¶ 5, Ex. A BURNS 42-44; Pierce Decl., ¶ 6, Ex. A BURNS 21-22, Ex. B BURNS 32-35, 46-49, 69, 72-74, 88-89, 99, 103-106).

8.      The Correction Officers then used physical force, including baton strikes and body holds, in an attempt to try to stop the inmates from continuing to assaulting each other. (CO Cocuzza Decl., ¶ 8, Ex. A BURNS 107; Lt. Cocuzza Decl., ¶ 7, Ex. A Burns 40; Pierce Decl., ¶ 6, Ex. A BURNS 21-22, Ex. B BURNS 32-35, 46-49, 69, 72-74, 88-89, 99, 103-106).

9.      Some non-fighting inmates then stood up from their seats and began to shout at the fighting inmates. (Nagy Decl., ¶ 5, Ex. A, BURNS 42-44; Lt. Cocuzza Decl., ¶ 8-9, Ex. A BURNS 40; Pierce Decl., Ex. A BURNS 22).

10.     In response, C.O. Nagy released chemical agents by the serving counter, above the area directly adjacent to the mess hall counters. (Nagy Decl., ¶ 6, Ex. A BURNS 42-44; Lt. Cocuzza Decl., ¶ 10, Ex. A BURNS 40).

11.      C.O. Nagy chose this location because he was attempting to control the situation

through an application of minimal force – there were very few inmates in this area; and many of the tables were empty. (Nagy Decl., ¶ 6).

12. The non-fighting inmates began returning to their seats, and what appeared to be an orderly evacuation began. (Id., ¶ 7, Ex. A BURNS 42-44; Pierce Decl., ¶ 7, Ex. A BURNS 22).

13. An inmate stood up and began creating a disturbance. (C.O. Cocuzza Decl., ¶ 10-13, Ex. B BURNS 49, Ex. C BURNS 45; Nagy Decl., ¶ 8, Ex. A BURNS 42-44; Lt. Cocuzza Decl., ¶ 11, Ex. A BURNS 40).

14. C.O. Cocuzza heard the inmate yelling "this isn't a riot, let['s] get this shit started. [L]et's riot, fuck these guys." (C.O. Cocuzza Decl., ¶ 10-13, Ex. B BURNS 49, Ex. C).

15. The inmate refused all staff direction to stop. (C.O. Cocuzza Decl., ¶ 10-13, Ex. B BURNS 49, Ex. C BURNS 45; Nagy Decl., ¶¶ 8, 10, Ex. A BURNS 42-44; Lt. Cocuzza Decl., ¶ 11, Ex. A BURNS 40).

16. Some of the inmates reacted by standing up. (C.O. Cocuzza Decl., ¶ 13, Ex. B BURNS 49, Ex. C BURNS 45; Pierce Decl., ¶ 7, Ex. A BURNS 22-23).

17. Yet a different inmate refused staff direction to place his hands on the wall, approaching one of the officers in a threatening manner, attempting to join the fight. (Lt. Cocuzza Decl., ¶12, Ex. A BURNS 40; Nagy Decl., ¶ 11, Ex. A BURNS 42-44; Pierce Decl., ¶ 7, Ex. A BURNS2 23; Ex. B BURNS 38-39, 85, 88). Physical force had to be used to restrain this inmate.

18. C.O. Nagy became alarmed when he observed an inmate stand up and gestured towards the other inmates, as if to stir them up, and a different inmate try to assault officer Thorne. (Nagy Decl., ¶¶ 10-11, BURNS 42-44; Pierce Decl., ¶ 7, Ex. B BURNS 85, 88-89).

19. C.O. Nagy also overheard officers yelling in the corridor underneath the gas

3

booth. (Nagy Decl., ¶ 12, Ex. A BURNS 42-44).

20. C.O. Nagy then observed the seated inmates begin standing up, and observed an immediate threat to an officer when another inmate approached the officer from behind with his fist in a threatening manner. (Id., ¶¶ 13, 15, Ex. A BURNS 42-44).

21. C.O. Nagy responded to the disturbances by releasing more chemical agents in the mess hall. (Id., ¶ 16; Lt. Cocuzza Decl., ¶ 14, Ex. A BURNS 40; C.O. Cocuzza Decl., ¶ 13, E. B BURNS 49, Ex. C BURNS 45; Pierce Decl., ¶ 7, Ex. A BURNS 22-23).

22. C.O. Nagy's observation of the situation in the mess hall led him to believe that there was a significant danger that a riot was about to break out, and that an officer was in immediate danger of being attacked. (Nagy Decl., ¶¶ 15, 24, 25, Ex. A BURNS 42-44).

23. The chemical agent was deployed near the middle and front of the mess hall after it appeared to C.O. Nagy that his attempt to dispense to the area directly adjacent to the mess hall counters failed. (Nagy Decl., ¶¶ 16-17).

24. The chemical agents are available in three different levels of concentration and are activated by switches on a color coded panel in the booth. (Declaration of Daniel Huttel ("Huttel Decl."), ¶¶ 10-11; Nagy Decl., ¶¶ 6, 16-19, Ex. A BURNS 42-44).

25. The chemicals can be deployed by activating the yellow switch for the least concentration, an orange switch for the mid-level concentration, and a red switch for the highest concentration. (Id.; Pierce Decl., ¶ 17, Ex. A BURNS 22-23; Lt. Cocuzza, Ex. A BURNS 40).

26. Only the chemical agents activated by the yellow switch (the lowest concentration) were deployed to the entire mess hall. (Id. ¶ 14; Nagy Decl., 20, Ex. A BURNS 42-44; Pierce Decl., ¶ 7; Lt. Cocuzza Decl., Ex. A BURNS 40).

27. Plaintiff was not sitting in the area directly adjacent to the mess hall counters when the chemical agent was first deployed. (Dawkins Decl., Ex. A, pp. 59, 62).

4

28. Plaintiff was located approximately twenty feet away from the two fighting inmates, on the left side of the mess hall. (Id.).

29. Plaintiff cannot identify who was ordering the fighting inmates to "break it up" in the mess hall immediately before the chemical agent was first dropped. (Id., p. 165).

30. Plaintiff had a limited view of the mess hall. (Id., pp. 165, 167).

31. Officers were as exposed to the chemical agents released in the mess hall and some correctional staff were more directly exposed because the officers' booth was located directly under the area where the chemical agent was first released. (Lt. Cocuzza, ¶ 24; C.O. Cocuzza, ¶ 14; Declaration of Mark Tokarz ("Tokarz Decl."), ¶ 11; Dawkins Decl., Ex. A p. 70).

32. Correctional staff were not wearing any protective gear. (Lt. Cocuzza, ¶ 24).

33. The release of chemical agents was not planned in advance. (Id.).

34. Chemical agents are considered an effective law enforcement tool because they do not involve physical contact. (Pierce Decl., ¶ 8; Huttel Decl., ¶ 16).

35. The chemical agents used by DOCCS are less than lethal, quick acting, and have a short-term effect on the subject. (Pierce Decl., ¶ 20; Huttel Decl., ¶ 16).

36. Refusal to follow orders and interference with staff constitutes a threat to the safety and security of the facility. (Pierce Decl., ¶ 9).

37. Overtly disobeying direct orders also has the tendency to incite other inmates towards misbehavior and possible violence. It is not uncommon for a situation involving two inmates to escalate into one involving multiple inmates. (Id., ¶¶ 10, 15).

38. When faced with inmates refusing orders to comply, corrections officers must make a judgment call on how to gain the inmates' compliance with the least risk of harm to both the staff and inmates alike. (Id., ¶ 11).

39. C.O. Nagy's use of the chemical agent was consistent with DOCCS training,

policies, and procedures. (Id., ¶ 14).

40. C.O. Nagy complied with DOCCS procedures by using progressive use of force techniques in releasing the lowest concentration of chemical agent (by engaging the yellow switch), and then, as the situation continued, increasing the concentration of the chemical agents by attempting to release the orange and then red chemical agents. (Id., ¶ 17).

**B.     Decontamination After Chemical Agent Release**

41. Decontamination started as soon as the inmates were evacuated outside, into the C and D yard. (Pierce Decl., ¶ 21; Declaration of Mark Tokarz ("Tokarz Decl."), ¶ 8; Declaration of Captain Thomas Melville ("Melville Decl."), ¶ 8).

42. Sgt. Cocuzza was supervising in the yard. (Lt. Cocuzza Decl., ¶ 15).

43. The inmates were instructed to line up on or against the wall of the C and D yard by their housing block as a security measure to maintain order, obtain control, and protect staff from any potential attack. (Tokarz Decl., ¶ 9).

44. Inmates had to take turns using the shower facilities in the C and D yard because the six shower stalls were not enough to accommodate the approximately 200 inmates who had been evacuated into the yard. (Id., ¶ 14; Melville Decl., ¶ 10).

45. All inmates who were exposed to the chemical agents in the mess hall were afforded an opportunity to see medical staff. (Dawkins Decl., Ex. A pp. 103-104; Tokarz Decl., ¶¶ 12-13, 16; Melville Decl., ¶ 14; Lt. Cocuzza Decl., ¶ 19, Ex. A BURNS 41; Pierce Decl., Ex. BURNS 25).

46. Some inmates were sent immediately to the medical department and others saw medical staff on their housing unit. (Tokarz Decl., ¶¶ 12-13, 16).

47. Inmates who appeared to be in distress, or who complained of irritation or pain were sent to the medical unit immediately. (Id., ¶ 12).

48. Lt. Tokarz was not present in the yard when the inmates were evacuated into the C and D yard. (Id., ¶ 6).

49. Lt. Tokarz arrived after the inmates were already lined up on or against the wall. (Id., ¶ 9).

50. Lt. Tokarz does not know plaintiff. (Tokarz Decl., ¶ 15).

51. Plaintiff did not directly inform Lt. Tokarz that he needed medical attention. (Id., ¶ 16; Dawkins Decl., Ex. A pp. 94, 199).

52. Lt. Tokarz took inmates to the A & B yard to use the showers there, when that yard became available. (Id., ¶ 14; Compl., ¶ 18).

**C.    Medical Care**

53. Plaintiff was seen by a nurse for complaints related to his exposure to the chemical agents, after he had used the shower facilities and returned to his housing block, at approximately 1:45 p.m. (Melville Decl., ¶ 15, Ex. A BURNS 682; Dawkins Decl., Ex. A pp. 100, 103-105; Compl., ¶ 20).

54. In August of 2015, C.O. Shaw worked the 3-11 p.m. shift on B-block at Green Haven, where plaintiff was housed. (Declaration of Daniel Shaw ("Shaw Decl."), ¶¶ 3-5).

55. C.O. Shaw was stationed on the first deck and plaintiff was housed in cell 201, which is located on the second deck. (Id., ¶ 5).

56. On August 3, 2015, an officer called C.O. Shaw to come upstairs to speak to plaintiff. (Id.).

57. When C.O. Shaw arrived, plaintiff informed C.O. Shaw that his back and neck were hurting and asked C.O. Shaw to call for a medical response over the radio. (Id., ¶ 6).

58. C.O. Shaw told plaintiff that medical personnel would be on the unit shortly, however, a call would be placed to the medical unit. (Id.).

59. A call was placed to the medical unit, and the nurse instructed that plaintiff should be sent to medical the next day for sick call. (Id., ¶ 7, Ex. A BURNS 163).

60. On August 3, 2015, C.O. Shaw escorted nurses around the housing unit. The nurses informed plaintiff that they were specifically making rounds to deal with any medical concerns relating to the effects of the chemical agent. (Id., ¶ 9).

61. The radio emergency response system is typically used in situations where an inmate is not breathing, having a heart attack, is unconscious or passed out. (Id.).

62. Calling for an emergency response on the radio would have been inappropriate because C.O. Shaw did not see that plaintiff was experiencing a medical crisis. (Id., ¶¶ 10, 12).

63. C.O. Shaw observed plaintiff sitting up on his bed and talking, and. C.O. Shaw did not observe plaintiff having any difficulty speaking; plaintiff was alert and his speech was clear; plaintiff was not slurring his words; and there was no excessive sweating. (Id., ¶ 12).

64. C.O. Shaw did not observe any vomit on the floor of plaintiff's cell. (Id., ¶ 10).

65. During the five years C.O. Shaw was a corrections officer, he utilized the emergency response system on only two occasions. He used it for an inmate who was passed out in the hallway, who was experiencing difficulty breathing, after he observed the inmate go down onto one knee. C.O. Shaw also previously used the radio to call an emergency response for an inmate who was foaming at the mouth, with his eyes rolled back in his head, lying on his bed, and was non-responsive. (Id., 11).

66. C.O. Shaw was not aware that plaintiff had ever lost consciousness. No one at the time informed C.O. Shaw that plaintiff had lost consciousness. (Id., ¶ 13; Dawkins Decl., Ex. A pp. 201, 210).

67. Until C.O. Shaw read the allegations in this lawsuit, he had no knowledge that plaintiff claimed to have experienced any loss of consciousness. (Shaw Decl., ¶ 13).

68. Plaintiff was seen by medical personnel on August 4, 2015. (See Melville Decl., Ex. A BURNS 682; Dawkins Decl., pp. 118, 201).

**D.      Supt. Griffin Was Not Personally Involved**

69. There are approximately 900 employees and 2000 male inmates at Green Haven, a maximum security facility. (See Declaration of Thomas Griffin ("Griffin Decl."), ¶¶ 2, 5).

70. Plaintiff has had no personal interaction with Supt. Griffin. (Dawkins Decl., Ex. A pp. 179-180).

71. Supt. Griffin was not present in the mess-hall when the chemical agent was released on August 3, 2015. He did not authorize the deployment of the chemical agent before their use. (Griffin Decl., ¶ 14; Dawkins Decl., Ex. A p. 181; Lt. Cocuzza Decl., ¶ 24; Pierce Decl., Ex. A BURNS 26).

72. Supt. Griffin does not directly supervise C.O. Nagy. The supervision of Correction Officers is delegated to the Deputy Superintendents, Captains, Lieutenants, and Sergeants. (Griffin Decl., ¶¶ 6-7).

73. Supt. Griffin is not directly involved in the investigation of grievances against corrections officers. (Id., ¶ 10).

74. Pursuant to DOCCS Directive 4040, grievances alleging staff misconduct against a Correction Officer is investigated by that officer's supervisor. (Id., ¶¶ 9-10, Ex. A p. 16).

75. After the investigation into the grievance is completed, a summary of the findings is submitted to the grievance office; the grievance office then generates a memorandum and forwards that, along with any related materials to the superintendent's office for the superintendent's signature. (Id., ¶ 11).

76. Supt. Griffin is not aware of any substantiated allegations against C.O. Nagy for any staff misconduct. (Id., ¶ 12).

77. None of the allegations of wrongdoing filed against C.O. Nagy prior to August 3, 2015 were substantiated. (Id., ¶ 13).

Dated: New York, New York
December 13, 2017

Respectfully submitted,

ERIC T. SCHNEIDERMAN
Attorney General of the
 State of New York
Attorney for Defendants

By:___/s/_____
JULINDA DAWKINS
Assistant Attorney General
120 Broadway
New York, New York 10271
(212) 416-8118


JULINDA DAWKINS
Assistant Attorney General
Of Counsel