Exhibit E

# ABA Standards for Criminal Justice

Third Edition

## Treatment of Prisoners



# Introduction

These *Standards on the Treatment of Prisoners*, over five years in the drafting, were approved by the American Bar Association House of Delegates in February 2010. They replace the ABA's 1981 *Criminal Justice Standards on the Legal Status of Prisoners*, which were supplemented by two additions in 1985 but not subsequently amended.[1] In the 1980s, the now-replaced *Legal Status of Prisoners* Standards proved a useful source of insight and guidance for courts and correctional administrators, and were frequently cited and used. But this revision is long overdue: enormous changes have affected American corrections since 1981, and even in the 1990s, the 1981 standards had grown sadly out of date. It is this project's goal to provide up-to-date guidelines addressing current conditions and challenges and helping to shape the fair and humane development of the law and operation of the criminal justice system.

The most consequential factual change over the past decades has been the astronomical growth in incarceration in the United States. In 1981, 557,000 prisoners were held in American jails and prisons; that number has since skyrocketed to its current level of 2.4 million people on any given day—more than 1 of every hundred adults in America. The population explosion has imposed severe pressure on incarcerating authorities, as they attempt to cope with more people and longer terms of incarceration. New challenges have appeared and old ones have expanded (among them private prisons, long-term and extreme isolation of prisoners, and the special needs of a variety of prisoners). At the same time, increased scale and generations of experience with modern correctional approaches have produced many examples of expertise and excellence. Social science research has developed significant insights in a large body of highly respected work.

Relevant law has also changed considerably, expanding the scope of legal protection for prisoners in some areas while contracting that protection in others. International human rights standards have likewise evolved substantially, and more uniformly in favor of prisoners' rights. New approaches in corrections have elicited new legal standards and rules; new approaches to a variety of legal questions have varied in their application to corrections; and the application of the Eighth Amendment, the "basic concept underlying [which] is nothing less than the dignity of man," has continued to safeguard "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958).

While the need for regulation and reform of prisons and jails has increased with their population and experience with solutions has grown, much in the existing Standards has become outdated and many new issues are simply not addressed. The need for updating and reformulation is by this time both obvious and pressing.

In 2004, the Criminal Justice Standards Committee appointed a Task Force to propose revisions to the 1981 Standards. This Task Force, comprising many of the nation's correctional law experts, and assisted by many other experts, met in person seven times over two years. Throughout the process, it obtained the comments and participation of various organizational stakeholders—in particular, the American Correctional Association, the American Jail Association, the ACLU National Prison Project, and the U.S. Department of Justice. The members of the Task Force were unanimous in their approval of the 2007 draft. Prior to submission of the draft to the Standards Committee in the summer of 2007, substantial redrafting occurred in response to concerns expressed by several of the organizational liaisons.

The Standards Committee then reviewed and revised the revised Standards in detail, meeting (like the Task Force) seven times over the course of two years, and getting further outside comments during the last round of editing from, in particular, the Department of Justice liaison. The Committee was unanimous in approving the draft, which was then sent to the Criminal Justice Council and simultaneously to over 40 outside organizations and over 20 ABA entities. Further changes responsive to the many comments that were received were made prior to a first Council reading in August 2009 and a second in November 2009; the Standards were approved by the Council without dissent. In February 2010 the Standards on the Treatment of Prisoners were approved by the ABA House.

Over the years of development of the revised Standards, the Task Force on the Treatment of Prisoners, the Standards Committee, and the Criminal Justice Section Council took as their task Justice Anthony Kennedy's 2003 challenge to the ABA to address "the inadequacies—and the injustices—in our prison and correctional systems." The revised Standards apply to all prisoners confined in adult correctional and criminal detention facilities, regardless of age or immigration status, but do not seek to cover facilities dedicated entirely to either juvenile or immigration detention. While the 1981 Standards were an important starting point, the revised Standards identify significant current problems that were not addressed by the 1981 Standards, such as long-term and extreme isolation of prisoners, crowding, and prisoners whose mental and physical health or other circumstances create a variety of special needs.

Over the past decades, the ABA has passed numerous policies relating to corrections. The Bar's involvement in corrections has aimed to promote the fair and humane operation of jails and prisons, not merely to implement compliance with a constitutional floor. The revised Standards rely on these prior ABA policies and careful consideration of relevant correctional standards and policies, in particular accreditation standards of professional organizations like the American Correctional Association and the National Commission on Correctional Health Care. Accordingly, the revised Standards are very largely consonant with such existing standards—as well as entirely consistent with current good professional practice.

As with other ABA Standards, commentary to be published along with the Standards will discuss relevant sources of law—case law, statute, regulation, treaty, and administrative action—and explain where the Standards propose either alterations in the law (for several statutes) or coverage of some issue not currently legally constrained. It will also include a full set of cross-references, to other ABA Standards and to relevant professional standards.

The revised Standards are careful to avoid topics more appropriately left to operational experts rather than lawyers. The revised Standards —like the Standards they would replace—are

---

[1] There are currently 23 sets of ABA Criminal Justice Standards, many in their third edition, covering topics from *Discovery and Pretrial Release* to *Sentencing and Collateral Sanctions and Discretionary Disqualification of Convicted Persons*. See http://www.abanet.org/crimjust/standards/. The *Legal Status of Prisoners Standards* were in volume 23 when they came out in 1981, and that numbering has been preserved in this new (and re-titled) edition. See also 1984 *Mental Health Standards*, Part X ("Mentally Ill and Mentally Retarded Prisoners"). In August 2003, Part VIII of the 1981 Standards, on Civil Disabilities of Convicted Persons, was superseded by the new *Standards on Collateral Sanctions and Discretionary Disqualification of Convicted Persons*.

directed at establishing the conditions that should exist in confinement facilities. How these conditions come into being is left to the skill and resourcefulness of correctional administrators. There are no doctor-prisoner ratios here, no minimum law library collections or the like. It is clear that officials who run jails and prisons are better equipped than lawyer-observers to operationalize legal standards. For example, adequate light is necessary for humane operation of a prison, as stated in both the 1981 Standards and the revised Standards. But translation of this general command into a specific measure of "footcandles" in different settings is beyond the comparative advantage and appropriate role of the Bar.

In large part, the revised Standards state the law, with sources from the Constitution, federal statutes and regulations, and court decisions developing each. They also rely on other legal sources, such as settlements negotiated between the U.S. Department of Justice and state and local governments, under the Civil Rights of Institutionalized Persons Act (CRIPA), as well as non-DOJ consent decrees, as models for implementation of legal norms.

In addition, however, there are occasions in which the litigation-developed constitutional minima for prisoners' rights and their remediation omit critical issues that are of concern to criminal justice policymakers and correctional administrators. Two points are relevant here. First, courts grant correctional administrators a good deal of deference because of the principle of separation of powers. As the Supreme Court explained in *Lewis v. Casey*, 518 U.S. 343, 349 (1996):

It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution.

These revised Standards, which would offer advice not just to courts but to the political branches, are less deferential, because they have as their very purpose "to shape the institutions of government in such fashion as to comply with the laws and the Constitution." Many of them aim at what might be called the infrastructure of constitutional compliance. The Constitution does not, for example, guarantee prisoners trained correctional officers. But the Standards address training because it is a necessary precondition for compliance with substantive constitutional requirements. The Standards' role is to provide guidance to judges, policy-makers, lawyers, and correctional administrators, and to help shape the just development of the law and operation of the criminal justice system. It is for this reason that, like Chapter 23 decades ago, some of these Standards are aspirational, yet within the bounds of lawful and feasible correctional practice. We firmly believe that each and every one of these Standards reflects the best current thinking on the correctional practices necessary to protect prisoner's rights and operate safe, humane, and effective prisons.

ABA Criminal Justice Standards on the Treatment of Prisoners
Approved by the ABA House of Delegates, February 2010

# TABLE OF CONTENTS

Standard 23-1.0  Definitions..................................................................................................1

PART I: GENERAL PRINCIPLES..........................................................................................3
Standard 23-1.1  General principles governing imprisonment...............................................3
Standard 23-1.2  Treatment of prisoners..............................................................................4

PART II: INTAKE AND CLASSIFICATION........................................................................5
Standard 23-2.1  Intake screening........................................................................................5
Standard 23-2.2  Classification system.................................................................................5
Standard 23-2.3  Classification procedures...........................................................................5
Standard 23-2.4  Special classification issues........................................................................6
Standard 23-2.5  Health care assessment.............................................................................6
Standard 23-2.6  Rationales for segregated housing.............................................................7
Standard 23-2.7  Rationales for long-term segregated housing.............................................7
Standard 23-2.8  Segregated housing and mental health......................................................8
Standard 23-2.9  Procedures for placement and retention in long-term segregated housing..........9

PART III: CONDITIONS OF CONFINEMENT...................................................................12
Standard 23-3.1  Physical plant and environmental conditions............................................12
Standard 23-3.2  Conditions for special types of prisoners..................................................12
Standard 23-3.3  Housing areas...........................................................................................13
Standard 23-3.4  Healthful food..........................................................................................13
Standard 23-3.5  Provision of necessities............................................................................14
Standard 23-3.6  Recreation and out-of-cell time................................................................14
Standard 23-3.7  Restrictions relating to programming and privileges................................15
Standard 23-3.8  Segregated housing..................................................................................16
Standard 23-3.9  Conditions during lockdown....................................................................17

PART IV: RULES OF CONDUCT AND DISCIPLINE.........................................................18
Standard 23-4.1  Rules of conduct and informational handbook........................................18
Standard 23-4.2  Disciplinary hearing procedures..............................................................18
Standard 23-4.3  Disciplinary sanctions..............................................................................20

PART V: PERSONAL SECURITY.......................................................................................21
Standard 23-5.1  Personal security and protection from harm............................................21
Standard 23-5.2  Prevention and investigation of violence.................................................21
Standard 23-5.3  Sexual abuse............................................................................................21
Standard 23-5.4  Self-harm and suicide prevention............................................................22
Standard 23-5.5  Protection of vulnerable prisoners...........................................................23
Standard 23-5.6  Use of force.............................................................................................23
Standard 23-5.7  Use of deadly force..................................................................................26
Standard 23-5.8  Use of chemical agents, electronic weaponry, and canines......................27
Standard 23-5.9  Use of restraint mechanisms and techniques...........................................28

PART VI: HEALTH CARE...................................................................................................30
Standard 23-6.1  General principles governing health care.................................................30
Standard 23-6.2  Response to prisoner health care needs....................................................30
Standard 23-6.3  Control and distribution of prescription drugs.........................................31
Standard 23-6.4  Qualified health care staff........................................................................31
Standard 23-6.5  Continuity of care....................................................................................31
Standard 23-6.6  Adequate facilities, equipment, and resources.........................................32
Standard 23-6.7  Quality improvement...............................................................................33
Standard 23-6.8  Health care records and confidentiality...................................................33
Standard 23-6.9  Pregnant prisoners and new mothers.......................................................34
Standard 23-6.10  Impairment-related aids.........................................................................35
Standard 23-6.11  Services for prisoners with mental disabilities......................................35
Standard 23-6.12  Prisoners with chronic or communicable diseases................................36
Standard 23-6.13  Prisoners with gender identity disorder.................................................36
Standard 23-6.14  Voluntary and informed consent to treatment.......................................36
Standard 23-6.15  Involuntary mental health treatment and transfer..................................37

PART VII: PERSONAL DIGNITY.......................................................................................40
Standard 23-7.1  Respect for prisoners...............................................................................40
Standard 23-7.2  Prisoners with disabilities and other special needs..................................40
Standard 23-7.3  Religious freedom....................................................................................41
Standard 23-7.4  Prisoner organizations.............................................................................42
Standard 23-7.5  Communication and expression..............................................................42
Standard 23-7.6  Personal appearance................................................................................43
Standard 23-7.7  Records and confidentiality.....................................................................43
Standard 23-7.8  Searches of facilities................................................................................44
Standard 23-7.9  Searches of prisoners' bodies..................................................................44
Standard 23-7.10  Cross-gender supervision......................................................................46
Standard 23-7.11  Prisoners as subjects of behavioral or biomedical research...................46

PART VIII: REHABILITATION AND REINTEGRATION................................................48
Standard 23-8.1  Location of facilities................................................................................48
Standard 23-8.2  Rehabilitative programs..........................................................................48
Standard 23-8.3  Restorative justice...................................................................................49
Standard 23-8.4  Work programs.......................................................................................49
Standard 23-8.5  Visiting....................................................................................................50
Standard 23-8.6  Written communications........................................................................52
Standard 23-8.7  Access to telephones...............................................................................53
Standard 23-8.8  Fees and financial obligations.................................................................53
Standard 23-8.9  Transition to the community..................................................................53

PART IX: GRIEVANCES AND ACCESS TO COURTS ............................................................... 56
Standard 23-9.1    Grievance procedures ........................................................................... 56
Standard 23-9.2    Access to the judicial process .............................................................. 57
Standard 23-9.3    Judicial review of prisoner complaints ................................................ 58
Standard 23-9.4    Access to legal and consular services .................................................. 58
Standard 23-9.5    Access to legal materials and information .......................................... 60

PART X: ADMINISTRATION AND STAFFING ............................................................................ 62
Standard 23-10.1   Professionalism ................................................................................... 62
Standard 23-10.2   Personnel policy and practice .............................................................. 62
Standard 23-10.3   Training ............................................................................................... 63
Standard 23-10.4   Accountability of staff ......................................................................... 64
Standard 23-10.5   Privately operated correctional facilities ............................................ 64

PART XI: ACCOUNTABILITY AND OVERSIGHT ..................................................................... 67
Standard 23-11.1   Internal accountability ......................................................................... 67
Standard 23-11.2   External regulation and investigation .................................................. 68
Standard 23-11.3   External monitoring and inspection ..................................................... 68
Standard 23-11.4   Legislative oversight and accountability ............................................. 69
Standard 23-11.5   Media access to correctional facilities and prisoners .......................... 69

Standard 23-1.0    Definitions

*Correctional agencies, facilities, staff and prisoners*

(a) The term "chief executive officer of the facility" means the correctional official with command authority over a particular correctional facility. In a prison, the chief executive officer is the person usually termed the warden; in a jail, the chief executive officer might be a sheriff, or might have a title such as superintendent, jailer, or commander. The term includes the chief executive officer's emergency designee, if, for example, the chief executive officer is away or ill and has turned over command authority for a period of time.

(b) The term "correctional administrator" means an individual with responsibility for system-wide operations and management.

(c) The term "correctional agency" means an agency that operates correctional facilities for a jurisdiction or jurisdictions and sets system-wide policies or procedures, along with that agency's decision-makers.

(d) The term "correctional authorities" means all correctional staff, officials, and administrators.

(e) The term "correctional facility" means any place of adult criminal detention, including a prison, jail, or other facility operated by or on behalf of a correctional or law enforcement agency, without regard to whether such a facility is publicly or privately owned or operated. The term "correctional facility" does not include a facility that serves solely as an immigration detention facility, a juvenile detention facility, or a juvenile correctional facility.

(f) The term "correctional official" means an individual with responsibility for facility-wide operations and management.

(g) The term "correctional staff" or "staff" means employees who have direct contact with prisoners, including both security and non-security personnel, and employees of other governmental or private organizations who work within a correctional facility.

(h) The term "governmental authorities" encompasses persons in all branches and levels of government whose conduct affects correctional policy or conditions, including members of the legislature, prosecutors, judges, governors, etc.

(i) The term "jail" means a correctional facility holding primarily pretrial detainees and/or prisoners sentenced to a term of one year or less.

(j) The term "prison" means a correctional facility holding primarily prisoners sentenced to a term of at least one year.

(k) The term "prisoner" means any person incarcerated in a correctional facility.

*Other defined terms*

(l) The term "counsel" means retained or prospectively retained attorneys, or others sponsored by an attorney such as paralegals, investigators, and law students.

(m) The term "effective notice" means notice in a language understood by the prisoner who receives the notice; if that prisoner is unable to read, effective notice requires correctional staff to read and explain the relevant information, using an interpreter if necessary.

(n) The term "health care" means the diagnosis and treatment of medical, dental, and mental health problems.

(o) The term "long-term segregated housing" means segregated housing that is expected to extend or does extend for a period of time exceeding 30 days.

(p) The term "qualified health care professional" means physicians, physician assistants, nurses, nurse practitioners, dentists, qualified mental health professionals, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and provide health care to patients.

(q) The term "qualified mental health professional" means psychiatrists, psychologists, psychiatric social workers, licensed professional counselors, psychiatric nurses, or others who by virtue of their education, credentials, and experience are permitted by law to evaluate and provide mental health care to patients.

(r) The term "segregated housing" means housing of a prisoner in conditions characterized by substantial isolation from other prisoners, whether pursuant to disciplinary, administrative, or classification action. "Segregated housing" includes restriction of a prisoner to the prisoner's assigned living quarters.

(s) The term "serious mental illness" means a substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to recognize reality or cope with the ordinary demands of life within the prison environment and is manifested by substantial pain or disability. It includes the status of being actively suicidal; severe cognitive disorders that result in significant functional impairment; and severe personality disorders that result in significant functional impairment and are marked by frequent episodes of psychosis, depression, or self-injurious behavior.

(b) Informal resolution of minor disciplinary violations should be encouraged provided that prisoners have notice of the range of sanctions that may be imposed as a result of such an informal resolution, those sanctions are only minimally restrictive, and the imposition of a sanction is recorded and subject to prompt review by supervisory correctional staff, ordinarily on the same day.

(c) Correctional authorities should be permitted to confine a prisoner in segregated housing pending the hearing required by subdivision (d) of this Standard, if necessary for individual safety or institutional security. Such prehearing confinement should not exceed [3 days] unless necessitated by the prisoner's request for a continuance or by other demonstrated good cause. Prisoners should receive credit against any disciplinary sentence for time served in prehearing confinement if prehearing conditions were substantially similar to conditions in disciplinary segregation.

(d) When the possible sanction for a disciplinary offense includes the delay of a release date, loss of sentencing credit for good conduct or good conduct time earning capability, or placement in disciplinary segregation, a prisoner should be found to have committed that offense only after an individualized determination, by a preponderance of the evidence. In addition, the prisoner should be afforded, at a minimum, the following procedural protections:

(i) at least 24 hours in advance of any hearing, written and effective notice of the actions alleged to have been committed, the rule alleged to have been violated by those actions, and the prisoner's rights under this Standard;

(ii) an impartial decision-maker;

(iii) a hearing at which the prisoner may be heard in person and, absent an individualized determination of good cause, has a reasonable opportunity to present available witnesses and documentary and physical evidence;

(iv) absent an individualized determination of good cause, opportunity for the prisoner to confront and cross-examine any witnesses or, if good cause to limit such confrontation is found, to propound questions to be relayed to the witnesses;

(v) an interpreter, if necessary for the prisoner to understand or participate in the proceedings;

(vi) if the decision-maker determines that a prisoner is unable to prepare and present evidence and arguments effectively on his or her own behalf, counsel or some other advocate for the prisoner, including a member of the correctional staff or another prisoner with suitable capabilities;

(vii) an independent determination by the decision-maker of the reliability and credibility of any confidential informants;

(viii) a written statement setting forth the evidence relied on and the reasons for the decision and the sanction imposed, rendered promptly but no later than [5 days] after conclusion of the hearing except in exceptional circumstances where good cause for the delay exists; and

(ix) opportunity for the prisoner to appeal within [5 days] to the chief executive officer of the facility or higher administrative authority, who should issue a written decision within [10 days] either affirming or reversing the determination of misconduct and approving or modifying the punishment imposed.

(e) If correctional officials conduct a disciplinary proceeding during the pendency of a criminal investigation or prosecution, correctional authorities should advise the prisoner of the right to remain silent during the proceeding, and should not use that silence against the prisoner.

(f) A prisoner should be permitted to waive the right to a hearing if the prisoner so chooses after being informed of the disciplinary offense of which he or she is accused and the potential penalties and other consequences; such a waiver should be made in person to a designated correctional official who should accept it only if the prisoner understands the consequences.

Standard 23-4.3    Disciplinary sanctions

(a) Correctional authorities should be permitted to impose a range of disciplinary sanctions to maintain order and ensure the safe custody of prisoners. Sanctions should be reasonable in light of the offense and the prisoner's circumstances, including disciplinary history and any mental illness or other cognitive impairment. In addition to the limitations itemized in Standard 23-3.7, sanctions should never include:

(i) corporal punishment;
(ii) conditions of extreme isolation as described in Standard 23-3.8(b);
(iii) use of restraints, such as handcuffs, chains, irons, strait-jackets, or restraint chairs; or
(iv) any other form of cruel, inhuman, or degrading treatment.

(b) Only the most severe disciplinary offenses, in which safety or security are seriously threatened, ordinarily warrant a sanction that exceeds [30 days] placement in disciplinary housing, and no placement in disciplinary housing should exceed one year.

(c) No disciplinary sanction should ever be administered by other prisoners, even under the direction of correctional authorities.

# PART V: PERSONAL SECURITY

Standard 23-5.1  Personal security and protection from harm

(a) Correctional authorities should protect prisoners from physical injury, corporal punishment, sexual assault, extortion, harassment, and personal abuse, among other harms.

(b) Correctional authorities should exercise reasonable care with respect to property prisoners lawfully possess or have a right to reclaim. A remedy should be reasonably available to prisoners if correctional authorities negligently or intentionally destroy or lose such property.

Standard 23-5.2  Prevention and investigation of violence

(a) Correctional and governmental authorities should take all practicable actions to reduce violence and the potential for violence in correctional facilities and during transport, including:

(i) using a validated objective classification system and instrument as provided in Standard 23-2.2;
(ii) preventing crowding as provided in Standard 23-3.1(b);
(iii) ensuring adequate and appropriate supervision of prisoners during transport and in all areas of the facility, preferably direct supervision in any congregate areas;
(iv) training staff and volunteers appropriately as provided in Standard 23-10.3;
(v) preventing introduction of drugs and other contraband, and providing substance abuse treatment as provided in Standard 23-8.2(b);
(vi) preventing opportunities for prisoners to exercise coercive authority or control over other prisoners, including through access to another prisoner's confidential information;
(vii) preventing opportunities for gangs to gain any power;
(viii) promptly separating prisoners when one may be in danger from another;
(ix) preventing staff from tolerating, condoning, or implicitly or explicitly encouraging fighting, violence, bullying, or extortion;
(x) regularly assessing prisoners' level of fear of violence and responding accordingly to prisoners' concerns; and
(xi) preventing idleness by providing constructive activities for all prisoners as provided in Standards 23-8.2 and 23-8.4.

(b) Correctional officials should promptly and thoroughly investigate and make a record of all incidents involving violence, and should take appropriate remedial action.

Standard 23-5.3  Sexual abuse

(a) Correctional authorities should protect all prisoners from sexual assault by other prisoners, as well as from pressure by other prisoners to engage in sexual acts. Correctional officials should strive to create an institutional culture in which sexual assault or sexual pressure is not tolerated, expected, or made the subject of humor by staff or prisoners. Correctional authorities should evaluate reports of sexual assault or threats of sexual assault without regard to a prisoner's sexual orientation, gender, or gender identity and should not be permitted to retaliate formally or informally against prisoners who make such reports. Correctional authorities should not presume that sexual activity among prisoners is consensual.

(b) Correctional authorities should protect all prisoners from any sexual contact with or sexual exploitation by staff, including volunteers and employees of other governmental or private organizations who work in the correctional facility. States and the federal government should prohibit by statute and correctional agencies by policy any form of sexual contact between staff and prisoners.

(c) Correctional officials should establish and publicize the means by which prisoners and others may easily and confidentially report to any staff member or appropriate outside entity a sexual assault or pressure to engage in sexual acts, sexual contact or exploitation involving a prisoner and staff, or the fear of such conduct. Correctional authorities should promptly relay any such report, or any other information they obtain regarding such conduct, to the chief executive officer of the facility. Correctional officials should implement a policy of prompt and thorough investigation of any credible allegation of the threat or commission of prisoner sexual assault or sexual contact with or sexual exploitation by staff. Correctional officials should establish criteria for forwarding such reports to a specialized unit trained in the appropriate investigation methods. Correctional authorities should take steps necessary to protect the prisoner from further sexual assaults, contacts, or exploitation. If a complaining prisoner and the subject of the complaint are separated during any such investigation, care should be taken to minimize conditions for the complaining prisoner that a reasonable person would experience as punitive.

(d) Medical treatment and testing, and psychological counseling should be immediately available to victims of sexual assault or of sexual contact with or sexual exploitation by staff. Correctional authorities, including health care staff, should be alert to identify and document signs of sexual assault and should implement a protocol for providing victims with a thorough forensic medical examination performed by an appropriately trained qualified medical professional.

(e) Correctional authorities, including health care staff, should not reveal information about any incident of prisoner sexual abuse to any person, except to other staff or law enforcement personnel who need to know about the incident in order to make treatment, investigation, or other security or management decisions, or to appropriate external oversight officials or agencies.

**Standard 23-5.4 Self-harm and suicide prevention**

(a) Correctional officials should implement procedures to identify prisoners at risk for suicide and to intervene to prevent suicides.

(b) When the initial screening pursuant to Standard 23-2.1 or any subsequent observation identifies a risk of suicide, the prisoner should be placed in a safe setting and promptly evaluated by a qualified mental health professional, who should determine the degree of risk, appropriate level of ongoing supervision, and appropriate course of mental health treatment.

(c) Instead of isolating prisoners at risk of suicide, correctional authorities should ordinarily place such prisoners in housing areas that are designed to be suicide resistant and that allow staff a full and unobstructed view of the prisoners inside. A suicidal prisoner's clothing should be removed only if an individualized assessment finds such removal necessary, and the affected prisoner should be provided with suicide resistant garments that are sanitary, adequately modest, and appropriate for the temperature. Physical restraints should be used only as a last resort and their use should comply with the limitations in Standard 23-5.9.

(d) At a minimum, prisoners presenting a serious risk of suicide should be housed within sight of staff and observed by staff, face-to-face, at irregular intervals of no more than 15 minutes. Prisoners currently threatening or attempting suicide should be under continuous staff observation. Suicide observation should be documented, and prisoners under suicide observation should be evaluated by a qualified mental health professional prior to being removed from observation.

(e) Correctional authorities should minimize the risk of suicide in housing areas and other spaces where prisoners may be unobserved by staff by eliminating, to the extent practicable, physical features that facilitate suicide attempts.

(f) When staff observe a prisoner who appears to have attempted or committed suicide, they should administer appropriate first-aid measures immediately until medical personnel arrive and assess the situation. Cut-down tools should be readily available to security personnel, who should be trained in first aid and cardiopulmonary resuscitation, cut-down techniques, and emergency notification procedures.

**Standard 23-5.5 Protection of vulnerable prisoners**

(a) The term "protective custody" means housing of a prisoner in segregated housing or under any other substantially greater restrictions than those applicable to the general population with which the prisoner would otherwise be housed, in order to protect the prisoner from harm.

(b) Correctional officials should implement procedures for identifying those prisoners who are particularly vulnerable to physical or sexual abuse, manipulation, or psychologically harmful verbal abuse by other prisoners or by staff, and for protecting these and other prisoners who request and need protection.

(c) Correctional authorities should minimize the extent to which vulnerable prisoners needing protection are subjected to rules and conditions a reasonable person would experience as punitive. Correctional authorities should not stigmatize prisoners who need protection. Such prisoners should not be housed with prisoners who have been identified as potential aggressors.

(d) Correctional authorities should not assign a prisoner to involuntary protective custody for a period exceeding [30 days] unless there is a serious and credible threat to the prisoner's safety and staff are unable to adequately protect the prisoner either in the general population or by a transfer to another facility.

(e) At intervals not to exceed three months, correctional authorities should afford a prisoner placed in protective custody a review to determine whether there is a continuing need for separation from the general population.

(f) Consistent with such confidentiality as is required to prevent a significant risk of harm to other persons, a prisoner being evaluated for involuntary placement in protective custody should be permitted reasonable access to materials considered at both the initial and the periodic reviews, and should be allowed to meet with and submit written statements to persons reviewing the prisoner's classification.

(g) If correctional authorities assign a prisoner to protective custody, such a prisoner should be:

(i) housed in the least restrictive environment practicable, in segregated housing only if necessary, and in no case in a setting that is used for disciplinary housing;

(ii) allowed all of the items usually authorized for general population prisoners;

(iii) provided opportunities to participate in programming and work as described in Standards 23-8.2 and 8.4; and

(iv) provided the greatest practicable opportunities for out-of-cell time.

**Standard 23-5.6 Use of force**

(a) "Force" means offensive or defensive physical contact with a prisoner, including blows, pushes, or defensive holds, whether or not involving batons or other instruments or weapons; discharge of chemical agents; discharge of electronic weaponry; and application of restraints such as handcuffs, chains, irons, strait-jackets, or restraint chairs. However, force does not include a firm hold, or use of hand or leg restraints, or fitting of a stun belt, on an unresisting prisoner.

(b) Correctional authorities should use force against a prisoner only:
  (i) to protect and ensure the safety of staff, prisoners, and others; to prevent serious property damage; or to prevent escape;
  (ii) if correctional authorities reasonably believe the benefits of force outweigh the risks to prisoners and staff; and
  (iii) as a last alternative after other reasonable efforts to resolve the situation have failed.

(c) In no case should correctional authorities use force against a prisoner:
  (i) to enforce an institutional rule or an order unless the disciplinary process is inadequate to address an immediate security need;
  (ii) to gratuitously inflict pain or suffering, punish past or present conduct, deter future conduct, intimidate, or gain information; or
  (iii) after the risk that justified the use of force has passed.

(d) A correctional agency should implement reasonable policies and procedures governing staff use of force against prisoners; these policies should establish a range of force options and explicitly prohibit the use of premature, unnecessary, or excessive force. Control techniques should be intended to minimize injuries to both prisoners and staff. Except in highly unusual circumstances in which a prisoner poses an imminent threat of serious bodily harm, staff should not use types of force that carry a high risk of injury, such as punches, kicks, or strikes to the head, neck, face, or groin.

(e) Correctional authorities should not be assigned responsibilities potentially requiring the use of force unless they are appropriately trained for the anticipated type of force, and are initially and periodically evaluated as being physically and mentally fit for such hazardous and sensitive duties.

(f) Except in an emergency, force should not be used unless authorized by a supervisory officer. Such an officer should be called to the scene whenever force is used, to direct and observe but ordinarily not to participate in the physical application of force, and should not leave the scene until the incident has come to an end. To the extent practicable, continually operating stationary video cameras should be used in areas in which uses of force are particularly likely, such as intake areas, segregation, and mental health units. Correctional authorities should video and audio record every planned or anticipated use of force from the initiation of the action, and should begin recording any other use of force incident as soon as practicable after the incident starts.

(g) If practicable, staff should seek intervention and advice from a qualified mental health professional prior to a planned or predicable use of force against a prisoner who has a history of mental illness or who is exhibiting behaviors commonly associated with mental illness.

(h) Following any incident in which a prisoner is subjected to use of either chemical agents or any kind of weapon or is injured during a use of force, the prisoner should receive an immediate health care examination and appropriate treatment, including decontamination. Health care personnel should document any injuries sustained.

(i) Correctional agency policies should strive to ensure full staff accountability for all uses of force. Correctional authorities should memorialize and facilitate review of uses of force. Following any incident that involves a use of force against a prisoner, participants and witnesses should be interviewed or should file written statements. Correctional authorities should prepare a complete file for the chief executive officer of the facility, including a report, any recordings, and written statements and medical reports for both prisoners and staff. Correctional officials and administrators should review and retain the file for purposes of management, staff discipline, training, and the identification of trends.

(j) A jurisdiction or correctional agency should establish criteria, based on the extent of prisoner injury and the type of force, for forwarding use of force reports to a person or office outside the relevant facility's chain of command for a more in-depth investigation. Such investigation should take place for every use of force incident that results in a death or major traumatic injury to a prisoner or to staff.

Standard 23-5.7    Use of deadly force

(a) "Deadly force" means force that creates or is intended to create a substantial risk of death or serious bodily harm. The use of firearms should always be considered the use of deadly force.

(b) Correctional agency policies and procedures should authorize the use of deadly force only by security personnel trained in the use of deadly force, and only in a situation when correctional authorities reasonably believe that deadly force is necessary to prevent imminent death or serious bodily harm or to prevent an escape from a secure correctional facility, subject to the qualification in subdivision (c) of this Standard.

(c) Deadly force to prevent an escape should be permitted only when the prisoner is about to leave the secure perimeter of a correctional facility without authorization or, if the prisoner is permitted to be on the grounds outside the secure perimeter, the prisoner is about to leave the facility grounds without authorization. Before staff use a firearm to prevent an escape, they should shout a warning and, if time and circumstances allow, summon other staff to regain control without shooting. For purposes of this subdivision, a prisoner in custody for transit to or from a secure correctional facility is considered to be within the perimeter of such facility.

(d) The location and storage of firearms should be strictly regulated. Correctional authorities carrying firearms should not be assigned to positions that are accessible to prisoners or in which they come into direct contact with prisoners, except during transport or supervision of prisoners outside the secure perimeter, or in emergency situations. In those situations, each staff member should also have available for use a weapon less likely to be lethal.

(e) Correctional authorities should be permitted to use canines inside the secure perimeter of a correctional facility only for searches and, except in emergencies, only if prisoners have been moved away from the area to be searched. Canines should never be used for purposes of intimidation or control of a prisoner or prisoners.

Standard 23-5.8   Use of chemical agents, electronic weaponry, and canines

(a) Correctional administrators should develop and implement policies governing use of chemical agents and electronic weaponry. Such policies should:

(i) provide for testing and training;
(ii) specify that, as with any use of force, chemical agents and electronic weaponry are to be used only as a last resort after the failure of other reasonable conflict resolution techniques;
(iii) cover the medical and tactical circumstances in which use of such agents and weaponry is inappropriate or unsafe;
(iv) forbid the use of such agents and weaponry directly on vital parts of the body, including genitals and, for electronic weaponry, eyes, mouth, and neck; and
(v) forbid the use of electronic weaponry in drive-stun or direct contact mode.

(b) Correctional agency policy should prohibit use of electronic or chemical weaponry for the following purposes:

(i) as punishment;
(ii) as a prod;
(iii) to rouse an unconscious, impaired, or intoxicated prisoner;
(iv) against any prisoner using passive resistance when there is no immediate threat of bodily harm; or
(v) to enforce an order after a prisoner has been immobilized or a threat has been neutralized.

(c) Correctional officials should implement any appropriate facility-specific restrictions on use of chemical agents and electronic weaponry that are appropriate for the particular facility and its prisoner population, and should promulgate policy that sets forth in detail the circumstances in which such weapons may be used.

(d) When practicable, before using either chemical agents or electronic weaponry against a prisoner, staff should determine whether the prisoner has any contraindicating medical conditions, including mental illness and intoxication, and make a contemporaneous record of this determination.

Standard 23-5.9   Use of restraint mechanisms and techniques

(a) Correctional authorities should not use restraint mechanisms such as handcuffs, leg irons, straitjackets, restraint chairs, and spit-masks as a form of punishment or retaliation. Subject to the remainder of this Standard, restraints should not be used except to control a prisoner who presents an immediate risk of self-injury or injury to others, to prevent serious property damage, for health care purposes, or when necessary as a security precaution during transfer or transport.

(b) When restraints are necessary, correctional authorities should use the least restrictive forms of restraints that are appropriate and should use them only as long as the need exists, not for a pre-determined period of time. Policies relating to restraints should take account of the special needs of prisoners who have physical or mental disabilities, and of prisoners who are under the age of eighteen or are geriatric, as well as the limitations specified in Standard 23-6.9 for pregnant prisoners or those who have recently given birth. Correctional authorities should take care to prevent injury to restrained prisoners, and should not restrain a prisoner in any manner that causes unnecessary physical pain or extreme discomfort, or that restricts the prisoner's blood circulation or obstructs the prisoner's breathing or airways. Correctional authorities should not hog-tie prisoners or restrain them in a fetal or prone position.

(c) Correctional authorities should prevent co-mingling of restrained and unrestrained prisoners either in a correctional facility or during transport.

(d) Other than as allowed by subdivision (e) of this Standard, correctional authorities should not use restraints in a prisoner's cell except immediately preceding an out-of-cell movement or for medical or mental health purposes as authorized by a qualified medical or mental health professional. Reasonable steps should be taken during movement to protect restrained prisoners from accidental injury.

(e) If restraints are used for medical or mental health care purposes, the restrained prisoner should, if possible, be placed in a health care area of the correctional facility, and the decision to use, continue, and discontinue restraints should be made by a qualified health care professional, in accordance with applicable licensing regulations.

(f) Four- or five-point restraints should be used only if a prisoner presents an immediate and extreme risk of serious self-injury or injury to others and only after less restrictive forms of restraint have been determined likely to be ineffective to control the prisoner's risky behavior. Whenever practicable, a qualified health care professional should participate in efforts to avoid using four- or five-point restraints.

(g) If it is necessary for correctional authorities to apply four- or five-point restraints without participation of a qualified health care professional because the situation is an emergency and health care staff are not available, a qualified health care professional should review the situation as soon as possible and assess whether such restraints are appropriate. If correctional authorities have applied four- or five-point restraints without the participation of a qualified health care professional or if that professional disagrees with the application of the restraints, correctional authorities should notify the facility's chief executive office immediately on gaining control of the prisoner. The chief executive officer should decide promptly whether the use of such restraints should continue.

(h) Whether restraints are used for health care or for custodial purposes, during the period that a prisoner is restrained in a four- or five-point position, staff should follow established guidelines for use of the restraint mechanism that take into account the prisoner's physical condition, including health problems and body weight, should provide adequate nutrition, hydration, and toileting, and should take the following precautions to ensure the prisoner's safety:

   (i) for the entire period of restraint, the prisoner should be video- and audio-recorded;

   (ii) immediately, a qualified health care professional should conduct an in-person assessment of the prisoner's medical and mental health condition, and should advise whether the prisoner should be transferred to a medical or mental health unit or facility for emergency treatment;

   (iii) until the initial assessment by a qualified health care professional required by subdivision (ii), staff should continuously observe the prisoner, in person;

   (iv) after the initial medical assessment, at least every fifteen minutes medically trained staff should conduct visual observations and medical checks of the prisoner; log all checks, and evaluate the continued need for restraint;

   (v) at least every two hours, qualified health care staff should check the prisoner's range of motion and review the medical checks performed under subdivision (iv); and

   (vi) at least every four hours, a qualified medical professional should conduct a complete in-person evaluation to determine the prisoner's need for either continued restraint or transfer to a medical or mental health facility.

# PART VI: HEALTH CARE

Standard 23-6.1 General principles governing health care

(a) Correctional authorities should ensure that:

   (i) a qualified health care professional is designated the responsible health authority for each facility, to oversee and direct the provision of health care in that facility;

   (ii) prisoners are provided necessary health care, including preventive, routine, urgent, and emergency care;

   (iii) such care is consistent with community health care standards, including standards relating to privacy except as otherwise specified in these Standards;

   (iv) special health care protocols are used, when appropriate, for female prisoners, prisoners who have physical or mental disabilities, and prisoners who are under the age of eighteen or geriatric; and

   (v) health care that is necessary during the period of imprisonment is provided regardless of a prisoner's ability to pay, the size of the correctional facility, or the duration of the prisoner's incarceration.

(b) Prisoners should not be charged fees for necessary health care.

(c) Dental care should be provided to treat prisoners' dental pain, eliminate dental pathology, and preserve and restore prisoners' ability to chew. Consistent with Standard 23-2.5, routine preventive dental care and education about oral health care should be provided to those prisoners whose confinement may exceed one year.

(d) Prisoners should be provided timely access to appropriately trained and licensed health care staff in a safe and sanitary setting designed and equipped for diagnosis or treatment.

(e) Health care should be based on the clinical judgments of qualified health care professionals, not on non-medical considerations such as cost and convenience. Clinical decisions should be the sole province of the responsible health care professionals, and should not be countermanded by non-medical staff. Work assignments, housing placements, and diets for each prisoner should be consistent with any health care treatment plan developed for that prisoner.

(f) Prisoners should be provided basic educational materials relating to disease prevention, good health, hygiene, and proper usage of medication.