UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
TREVOR BURNS, :
                       Plaintiff, :
v. : **OPINION AND ORDER**
                                                           :
THOMAS GRIFFIN, MICHAEL T. NAGY, : 16 CV 782 (VB)
MARK A. TOKARZ, and DANIEL J. SHAW, :
                       Defendants. :
----------------------------------------------------------------x

Briccetti, J.:

Plaintiff Trevor Burns, proceeding pro se and in forma pauperis, alleges defendants violated his Eighth Amendment rights. Plaintiff brings Section 1983 claims for excessive force against defendant Correction Officer ("C.O.") Michael T. Nagy, deliberate indifference to serious medical needs against Lieutenant ("Lt.") Mark A. Tokarz and C.O. Daniel J. Shaw, and supervisory liability against Superintendent ("Supt.") Thomas Griffin.

Before the Court is defendants' motion for summary judgment. (Doc. #58).

For the reasons set forth below, defendants' motion is GRANTED IN PART and DENIED IN PART.

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## BACKGROUND

The parties submitted briefs, declarations with exhibits, and statements of material fact pursuant to Local Civil Rule 56.1, which reflect the following factual background.

I.     Release of Chemical Agents

Plaintiff is an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). The events relevant to this action occurred while plaintiff was incarcerated at Green Haven Correctional Facility ("Green Haven").

1

On August 3, 2015, two inmates began fighting near the mess hall counters during breakfast in the West Mess Hall. Plaintiff asserts there were between 150 and 200 inmates in the mess hall at the time; defendants assert there were approximately 354 inmates present. Non-party C.O. Robert J. Cocuzza called for security to respond. Multiple C.O.s then used physical force, including baton strikes and body holds, against the two inmates who were fighting.

Plaintiff and defendants offer two very different accounts of what happened next. According to defendant C.O. Nagy, who was stationed in the chemical agent booth above the mess hall about twenty feet high, and other C.O.s present at the time, non-fighting inmates stood up and began to shout in the direction of the fighting inmates. To C.O. Nagy, "it appeared . . . that all hell had broken loose." (Nagy Decl. ¶ 23). On the other hand, plaintiff, who was fifteen to twenty feet away from the fighting inmates, contends no one stood up from their seats or shouted—the inmates merely "watch[ed] what was going on." (Burns Dep. at 66).

C.O. Nagy had three chemical agents at his disposal. He released the least concentrated chemical agent into the area directly adjacent to the mess hall counters. Plaintiff contends the fighting inmates had already been handcuffed and immobilized by the time C.O. Nagy released the chemical agent.

Plaintiff and defendants also disagree on what occurred after C.O. Nagy released the chemical agent. According to defendants, some non-fighting inmates returned to their seats and other inmates began to evacuate in an orderly fashion. But then one inmate stood up, refused staff direction to sit down, and yelled, "this isn't a real riot let[']s get this shit started" and "let's riot, fuck these guys," to which many inmates stood up in reaction. (See, e.g., C.O. Cocuzza Decl. ¶¶ 10–13, Ex. B at BURNS 49, Ex. C at BURNS 50). Another inmate attempted to assault an officer. C.O. Nagy then heard what sounded like officers yelling and screaming in the

2

corridor underneath the chemical agent booth, noticed that inmates who had been orderly evacuating were now rushing out of the mess hall, and saw another inmate "approach an officer with his fists in a threatening manner." (Nagy Decl. ¶¶ 12–13, 15, Ex. A at BURNS 42–44). C.O. Nagy also saw that officers were still trying to apply mechanical restraints on the inmates who were fighting.

Plaintiff, on the other hand, contends there were no such incidents—officers had already subdued the two fighting inmates, no inmate yelled anything, no inmates stood up, and no inmate approached any officer in a threatening manner.

C.O. Nagy asserts that in response to the continued disorder, he attempted to release the medium concentration chemical agent above the area adjacent to the mess hall counters. The release mechanism failed, so C.O. Nagy attempted to release the highest concentration chemical agent above the area adjacent to the mess hall counters. Again nothing happened. C.O. Nagy then attempted to release the least, medium, and highest concentration chemical agents above the middle and front of the mess hall in succession. Eventually the least concentration chemical agent released throughout the entire mess hall. Plaintiff ran out of the mess hall, and in the process fell and was trampled by other inmates.

II. Decontamination

The inmates and officers exposed to the chemical agents were evacuated to the C and D yard. The inmates were instructed to line up on or against the wall. According to plaintiff, defendant Lt. Tokarz told officers, at least one of whom had a gun pointed at the inmates, to "take [the inmates] down" if they took their hands off the wall. (Burns Dep. at 94). Non-party Captain Thomas Melville, who was in the C and D yard during decontamination, asserts officers

3

were never told that.  Plaintiff, whose back and left arm were in pain, vomited and told officers he wanted to see a nurse.

There were only six shower stalls in the C and D yard.  Lt. Tokarz states there were over two hundred inmates in the yard; Plaintiff asserts there were fewer than fifty.  After about an hour, Lt. Tokarz led plaintiff and other inmates to the A and B yard to use that yard's shower stalls.  The inmates took turns using the showers and were instructed to remove their clothing and shoes, wash their faces, and get the gas out of their eyes.  Plaintiff contends that he was told to wash only his face and arms, and to "hurry up."  (Burns Dep. at 97).

III.  Medical Care

Plaintiff then went to his cell, and he saw a nurse at around 1:45 p.m. the same day.  Plaintiff complained of pain in his eyes, throat, and arms, among other things.  The nurse told him to drink fluids and wash his eyes, which plaintiff did.

Sometime later that afternoon, plaintiff began to have "dizzy spells," vomited, and fell unconscious.  (Burns Dep. at 106).  An officer found plaintiff as he regained consciousness and called over defendant C.O. Shaw for assistance.  Plaintiff says the officer "told [C.O. Shaw] to call a medical response over the walkie-talkie."  (Id. at 111).

Plaintiff also told C.O. Shaw that his back and neck hurt and asked him to call a medical response on his radio.  According to plaintiff, C.O. Shaw saw the vomit on the floor of his cell, but C.O. Shaw asserts he did not.  C.O. Shaw states he observed plaintiff sitting up on his bed, not excessively sweating, and speaking without any difficulty or slurring of his words.  According to C.O. Shaw, "[t]here was no outward appearance that plaintiff was in immediate medical crisis."  (Shaw Decl. ¶ 12).

C.O. Shaw or another officer called the medical department, and a nurse told the officer to list plaintiff for emergency sick call the following morning. According to plaintiff, C.O. Shaw refused to call for an emergency response over the radio. Plaintiff also asserts C.O. Shaw contacted the wrong nurse and did not communicate all of plaintiff's symptoms. In addition, plaintiff asserts C.O. Shaw laughed as he walked away, saying, "big guy wanted me to call." (Burns Dep. at 200).

Plaintiff saw medical personnel regarding symptoms resulting from his exposure to the chemical agents on August 4, 5, and 6, and several more times during August 2015.

## DISCUSSION

I. <u>Legal Standard</u>

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." <u>Wilson v. Nw. Mut. Ins. Co.</u>, 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted). It is the moving party's burden to establish the absence of any genuine

issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations and quotation marks omitted). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. Dawson v. Cty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial. Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

II.  Excessive Force

Defendants argue plaintiff fails as a matter of law to establish a claim of excessive force in violation of the Eighth Amendment with regard to C.O. Nagy's use of chemical agents.

The Court disagrees.

There are two components to a claim of cruel and unusual punishment in violation of the Eighth Amendment: one objective and one subjective. Wright v. Goord, 554 F.3d 255, 268 (2d Cir. 2009). The objective inquiry focuses on the harm done in light of "contemporary standards of decency." Wright v. Goord, 554 F.3d at 268 (quoting Hudson v. McMillian, 503 U.S. 1, 8 (1992)). An inmate must show "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." Id. (internal citation omitted). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. . . . This is true whether or not significant injury is evident.'" Id. at 268–69 (quoting Hudson v. McMillian, 503 U.S. at 9). "Although not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights, a showing of extreme injury is not required to bring an excessive force claim if the alleged conduct involved unnecessary and wanton infliction of pain." Toliver v. N.Y.C. Dep't of Corr., 202 F. Supp. 3d 328, 334–35 (S.D.N.Y. July 29, 2016) (internal quotation marks and citations omitted).

As for the subjective inquiry, an inmate must show the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." Wright v. Goord, 554 F.3d at 268 (internal citation omitted). "The test of whether use of force in prison constitutes excessive force contrary to the Eighth Amendment is whether the force was used in a good-faith effort to maintain or

restore discipline, or maliciously and sadistically to cause harm." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (citing Hudson v. McMillian, 503 U.S. at 7). "To determine whether defendants acted maliciously or wantonly, a court must examine several factors including: the extent of the injury and the mental state of the defendant, as well as 'the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.'" Id. (quoting Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993)). In cases when a prison official uses a chemical spray against a compliant prisoner, the subjective element is satisfied when spraying the prisoner "cannot be characterized as an attempt to maintain or restore discipline." Parsons v. City of N.Y., 2017 WL 2656135, at *3 (E.D.N.Y. June 19, 2017).[1]

Here, there is a genuine issue of material fact as to whether C.O. Nagy's release of the chemical agents was objectively harmful enough to establish a constitutional violation. Plaintiff testified he was in "excruciating pain" (Burns Dep. at 99), and suffered an eye infection, back pain, and headaches. He also testified he vomited multiple times and fell unconscious.

Moreover, the Court cannot find, as a matter of law, that C.O. Nagy's release of the chemical agents was a good-faith effort to maintain or restore discipline. Whereas defendants assert there were multiple disturbances in the mess hall when C.O. Nagy released the chemical agents, plaintiff testified officers had already subdued the inmates who were fighting and no other inmates were shouting, standing up, or threateningly approaching officers.

---

[1] Plaintiff will be provided with copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d. Cir. 2009).

Defendants argue the Court should discount plaintiff's testimony because it is self-serving, and plaintiff was not able to view the entire mess hall at the time of the incident. Defendants' arguments go to the credibility of plaintiff's deposition testimony, and "as a general rule, a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury." Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010).

Defendants also argue plaintiff cannot show malicious intent because C.O. Nagy's fellow officers were present when he released the chemical agents. However, a reasonable jury could find C.O. Nagy did not release the chemical agents in a good-faith effort to restore or maintain order despite the presence of officers in the mess hall.

Accordingly, summary judgment on plaintiff's claim for excessive force against C.O. Nagy is unwarranted.

III.    Inadequate Medical Care

Defendants argue plaintiff fails as a matter of law to establish claims of deliberate indifference to medical care with regard to Lt. Tokarz and C.O. Shaw.

The Court agrees.

To succeed on a claim for constitutionally inadequate medical care under the Eighth Amendment's ban on cruel and unusual punishment, a prisoner must make a sufficient showing of "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). This test has both an objective and a subjective component: plaintiff must establish (i) the alleged deprivation of adequate medical care is "sufficiently serious," and (ii) the officials in question acted with a "sufficiently culpable state of mind." Salahuddin v. Goord, 467 F.3d 263, 279–80 (2d Cir. 2006).

9

The objective component of an Eighth Amendment inadequate medical care claim has two subparts. "The first inquiry is whether the prisoner was actually deprived of adequate medical care," keeping in mind that only "reasonable care" is required. Salahuddin v. Goord, 467 F.3d at 279 (citing Farmer v. Brennan, 511 U.S. 825, 844–47 (1970)). "[P]rison officials who act reasonably in response to an inmate-health risk cannot be found liable under the Cruel and Unusual Punishments Clause." Id. at 279–80 (citing Farmer v. Brennan, 511 U.S. at 845) (alterations omitted).

"Second, the objective test asks whether the inadequacy in medical care is sufficiently serious" by examining "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Salahuddin v. Goord, 467 F.3d at 280 (citing Helling v. McKinney, 509 U.S. 25, 32–33 (1993)). In determining whether an alleged injury is a "serious" medical condition, "[f]actors that have been considered include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting McGuckin v. Smith, 974 F.2d 1050, 1059–60 (9th Cir. 1992)).

Here, no reasonable juror could conclude Lt. Tokarz or C.O. Shaw deprived plaintiff of adequate medical treatment. The record shows plaintiff was afforded consistent medical treatment for exposure to the chemical agent as soon as he was evacuated from the mess hall. Plaintiff was sent to shower along with the other inmates within an hour of his exposure to the chemical agents; when showers became available in the A and B yard, Lt. Tokarz took inmates, including plaintiff, there to expedite the process; and when plaintiff told C.O. Shaw about his

10

need for medical attention, C.O. Shaw called the medical department and was told to list plaintiff for emergency sick call in the morning. Moreover, plaintiff saw medical personnel the same day C.O. Nagy released the chemical agents and several more times over the following days.

Nor could a reasonable juror find Lt. Tokarz or C.O. Shaw caused an unreasonable delay in plaintiff's treatment. In cases challenging the adequacy of the medical treatment given, "the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" Salahuddin v. Goord, 467 F.3d at 280 (quoting Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003)) (alterations omitted). "'It's the particular risk of harm faced by the prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes.'" Goris v. Breslin, 402 F. App'x 582, 585 (2d Cir. 2010) (summary order) (quoting Smith v. Carpenter, 316 F.3d 178, 186 (2d Cir. 2003)).

Here, as a matter of law, neither Lt. Tokarz nor C.O. Shaw unreasonably delayed plaintiff's treatment. To the extent Lt. Tokarz made plaintiff wait to take a shower, it was because the chemical agents affected numerous inmates even by plaintiff's count, and there were limited showers for the inmates to use in the yards. Moreover, to the extent Lt. Tokarz refused plaintiff's request to see medical personnel in the C and D yard, there is no evidence that the delay caused plaintiff additional harm. Likewise, even if C.O. Shaw's actions caused plaintiff to wait until the next day to see medical personnel, plaintiff has failed to provide any evidence that the delay caused plaintiff additional harm.


Accordingly, plaintiff's Eighth Amendment deliberate indifference claims against Lt. Tokarz and C.O. Shaw fail as a matter of law.

IV.     Superintendent Griffin

Defendants argue plaintiff's supervisory liability claim against Supt. Griffin fails as a matter of law because he was not personally involved in C.O. Nagy's release of the chemical agents.

The Court agrees.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Spavone v. N.Y. State Dep't of Corr. Servs., 719 F.3d 127, 135 (2d Cir. 2013) (internal citation omitted). A supervisor's personal involvement in an alleged constitutional violation may be established if:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). After Ashcroft v. Iqbal, however, district courts within this circuit have been divided as to whether claims alleging personal involvement under the second, fourth, and fifth of these factors remain viable. See Marom v. City of N.Y., 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016). The Second Circuit has yet to resolve this dispute. Id.

Moreover, because Section 1983 liability cannot be predicated on a theory of respondeat superior, see City of Canton v. Harris, 489 U.S. 378, 385 (1989), "[t]he bare fact that [a defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain

[a] claim," Colon v. Coughlin, 58 F.3d at 874. Thus, as a matter of law, a defendant's mere "receipt of a letter or grievance, without personally investigating or acting [thereon], is insufficient to establish personal involvement." Burns v. Fischer, 2014 WL 1413387, at *5 (N.D.N.Y. Feb. 3, 2014), adopted by 2014 WL 1413170 (N.D.N.Y. Apr. 11, 2014). There is no personal involvement when a prison official merely receives two letters and refers them for investigation and response. Goris v. Breslin, 402 F. App'x at 584. "Personal involvement will be found, however, where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint." Johnson v. Wright, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002).

Supt. Griffin was not in the mess hall when C.O. Nagy released the chemical agents. Instead, plaintiff argues Supt. Griffin is liable due to three unsubstantiated grievances filed against C.O. Nagy regarding incidents that occurred in February and April 2015. However, Supt. Griffin did not act on the grievances, and cannot be held liable for merely reviewing them.

Accordingly, plaintiff's claim against Supt. Griffin fails as a matter of law.

V.  Qualified Immunity

Defendants argue C.O. Nagy is entitled to qualified immunity.[2]

The Court disagrees.

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the

---

[2] Because plaintiff's claims against Lt. Tokarz and C.O. Shaw fail as a matter of law, the Court need not address whether they are entitled to qualified immunity.

13

law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996) (citations omitted). "Where a factual issue exists on the issue of motive or intent, a defendant's motion for summary judgment on the basis of qualified immunity must fail." Johnson v. Ganim, 342 F.3d 105, 117 (2d Cir. 2003); see also Atkins v. Cty. of Orange, 372 F. Supp. 2d 377, 403–04 (S.D.N.Y. 2005) (precluding summary judgment on defense of qualified immunity as to plaintiff's excessive force claim), aff'd sub nom. Bellotto v. Cty. of Orange, 248 F. App'x 232 (2d Cir. 2007) (amended summary order).

Here, as explained above, there are genuine issues of material fact as to C.O. Nagy's motive or intent to release the chemical agents. These factual issues preclude summary judgment on the defense of qualified immunity.

**CONCLUSION**

Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Plaintiff and counsel for defendants are directed to appear for a status conference on July 23, 2018, at 9:30 a.m., at which time the Court will set a trial date and a schedule for pretrial submissions, and will also address the question of whether to appoint counsel for plaintiff. Defendants' counsel shall make all necessary arrangements for plaintiff to appear by telephone.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

The Clerk is instructed to terminate the motion. (Doc. #58).

Dated: June 20, 2018
      White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge